STATE OF CONNECTICUT *vs.* PENELOPE R. RIPLEY AND OTHERS.

*R* mortgaged two tracts of land, one in Hartford, the other in Windsor Locks, to the State of Connecticut, to secure a loan from the school fund. Afterwards he conveyed the tract in Windsor Locks to *D*, who assumed the mortgage to the state by a clause in the deed, and also made a mortgage back to *R*, conditioned to save him harmless from the debt. *D* conveyed to *H* and *H* to *F* one of the respondents. The deed of *D* to *H* contained the same provision with regard to the payment of the mortgage debt by the grantee. That to *F* contained no such provision, but the amount of the debt was deducted from the price paid by him. After the conveyance from *D* to *H*, and before that to *F*, *R* agreed in writing under seal to make a record discharge of the mortgage from *D* to him, but did not actually do so. In a bill for foreclosure brought in the name of the state it was held,—1. That the tract in Windsor Locks had, by force of the provision in the deed of *R* to *D* that the grantee should pay the mortgage debt, become primarily liable to pay the debt. 2. That this liability was not removed by the mortgage of *D* to *R*, by which *D* agreed to pay the debt and save *R* harmless, this being given only for the additional security of *R*, and creating a distinct obligation from that imposed by the deed. 3. That the discharge of this mortgage by *R* did not operate to discharge the property from its special liability, and did not enure in any manner to the benefit of *F*.

BILL for a foreclosure, to which two cross-bills were filed. The facts as found by the court are as follows:—

On the 8th day of January, 1851, Phillip Ripley executed a bond and mortgage to the State of Connecticut, to secure a loan of $7,000 from the School Fund. The mortgaged premises consisted of one lot in the city of Hartford and two in the town of Windsor Locks. The property in Windsor Locks was afterwards conveyed to David S. Duncomb, the deed expressly providing that the grantee was to assume the mortgage debt to the state, and Duncomb also made a mortgage back to Ripley, conditioned to save him harmless from the debt to the state. From Duncomb the land passed to the Hartford Iron & Steel Works, a corporation, and from them to Joel Farist and John B. Winsor. Winsor afterwards quitclaimed to Farist, who was in possession at the time of the suit. The deed of Duncomb to the Hartford Iron & Steel Works contained a provision that the debt to the state was to be assumed by the grantees, and the amount of it was deducted from the price paid for the property. Both Farist and Winsor, when

they took their deed, had actual knowledge of the incumbrance and of the undertaking of Duncomb and of the Hartford Iron & Steel Works to pay the mortgage debt, and took their deed with the expectation that the Windsor Locks property would constitute the primary fund for the payment of this debt, and the sum paid for the property was fixed accordingly, but they had no knowledge of the agreement of Ripley to discharge the mortgage given him by Duncomb. After the land had passed from the possession of Duncomb and before the conveyance to Farist and Winsor, Ripley agreed by a writing under seal to make a record discharge of the mortgage from Duncomb to him, but this discharge was never given. The Hartford property, soon after the conveyance of the Windsor Locks property to Duncomb, was mortgaged by Phillip Ripley to Edwin G. Ripley.

Phillip Ripley died in 1862. His executor and devisees were made respondents, as were also the executors of Edwin G. Ripley, and Joel Farist the last grantee of the Windsor Locks property. The representatives of Phillip Ripley and of Edwin G. Ripley in their cross-bill prayed that the Windsor Locks property might be primarily subjected to the payment of the mortgage debt, which the respondent Farist by his cross-bill opposed. The superior court (*Carpenter, J.,*) so decreed, and the respondent Farist filed a motion in error, and brought the record before this court for revision.

*McFarland,* for the plaintiff in error.

1. As Farist is a subsequent purchaser for value under the mortgagor of a part of the mortgaged premises, it is clear that he would be entitled to a decree requiring the representatives of Ripley to redeem in exoneration of his estate, (1 Hilliard on Mortgages, 326 ; *Hunt* v. *Mansfield,* 31 Conn., 488,) unless they can show some superior equity in their favor as against Farist ; and to do this they must show, either, 1st, that Farist purchased the property subject to some legal and equitable lien previously imposed on it in favor of Ripley, by force of which it became the primary fund for the payment of the whole of the mortgage debt to the state, or 2d, that it became the primary

fund for the payment of that debt by virtue of some contract entered into by Farist with Ripley to that effect.

2. All Ripley's right to exonerate his part of the mortgaged premises at the expense of Duncomb, was derived from the obligation entered into by the latter. This obligation, though expressed in the deed from Ripley to Duncomb, and also in the mortgage from Duncomb to Ripley, was but one obligation, and whenever it ceased Ripley's right to exoneration ceased. Nor would it revive unless re-imposed on the land before its purchase by Farist.

3. A mortgage is but the incident to the obligation to secure the performance of which it is given. Whatever act transfers the beneficial interest in the obligation, *per se* transfers the beneficial interest in the mortgage, and whenever this obligation is released or in any manner extinguished, that moment the mortgage ceases in equity to be an incumbrance. 1 Hilliard on Mortgages, 215 ; 2 Swift Dig., 170.

4. The agreement of Ripley to release the Duncomb mortgage operated in equity as an absolute discharge both of the mortgage and the obligation which it was given to secure, and therefore released the Windsor Locks property from liability. It can make no difference that the mortgage was not in fact discharged of record, Ripley having received satisfaction of the obligation and agreed to discharge it. Equity will consider it as having been in fact discharged.

5. It will not be claimed that any obligation was ever re-imposed on the Windsor Locks property that it should be primarily liable, or any such right acquired by contract with Farist.

6. Ripley having released the Windsor Locks property, his representatives can not treat it as the primary fund for the payment of the mortgage to the state.

7. The court found that Farist and Winsor at the time of their purchase had actual knowledge of the incumbrance and expected to pay the mortgage debt, and had no knowledge of Ripley's agreement to release Duncomb. But this is only another mode of stating that by Ripley's wrongful omission to have the mortgage discharged of record, they were ignorant

of its discharge. It was as if Winsor and Farist had purchased the property, supposing it subject to a mortgage to Richard Roe which had in fact been discharged.

*T. C. Perkins* and *C. E. Perkins,* with whom was *E. Johnson,* for the defendant in error.

The agreement between Ripley and Duncomb that the mortgage of the latter to the former should be discharged, did not in any way affect the liability of the Windsor Locks property as a primary fund for the payment of the mortgage debt. This agreement was not that Ripley should pay the mortgage debt, that this property should not be primarily liable, nor even that Duncomb should not be liable to pay the debt. It was merely an agreement to give up the additional security which Ripley held. This was evidently agreed to be done only because Duncomb had sold the property to the Iron & Steel Works, who had assumed and agreed to pay the debt, and Ripley under these circumstances was satisfied with their responsibility and agreed to give up the bond. This is evident from the fact that Duncomb never took the trouble to obtain the bond, nor to have the mortgage formally discharged, showing that it was a matter of course and of no importance. It was at most merely a private agreement between Ripley and Duncomb, made when the latter had no interest in the property whatever, and could in no way affect the Iron & Steel Works, who then owned the property, much less Farist who purchased the property afterwards. It further appears from the finding that neither Farist nor Winsor, at the time they purchased the property, had any knowledge whatever of this agreement, and that the price which they paid for the property was fixed with reference to the payment of the mortgage debt out of it, or in other words that they were allowed the full amount of the mortgage in paying for the property. In these circumstances it would be most inequitable that the burden of the mortgage should be thrown on other property and their property so far released.

McCurdy, J. A brief examination of the facts in this case

will demonstrate that the view taken of it by the superior court was correct.

In 1851 Philip Ripley mortgaged to the state, as security for the sum of $7,000, two tracts of land, one in Hartford and the other in the town of Windsor Locks. In 1858 he conveyed the latter tract to Duncomb. The deed to him refers to and particularly specifies "the mortgage to the state of Connecticut school fund and interest from September 2, 1858, the principal of which amounts to the sum of $7,000, which the grantee assumes and agrees to pay in part consideration of this deed."

This stipulation is a part of the instrument which transfers the title, and fixes upon the land so conveyed the indebtedness to the state. In equity it affects not only the parties but the parcels, and the Hartford lot is relieved, and the Windsor Locks tract is burdened with the whole liability. In August, 1859, Duncomb conveyed the latter tract so incumbered to the Hartford Iron & Steel Works, who took it with a full knowledge of the incumbrance and an agreement to pay it. There was an express statement in the deed that the sum of $7,000, with interest accrued from the 2d of September, 1858, formed a part of the consideration of the deed, and had been deducted therefrom.

Subsequently this tract came into the possession of Farist, with a like knowledge of the incumbrance, and an expectation on his part that the property would constitute the primary fund for the payment of the debt, the amount of which was deducted from the price which he was to pay. A fund was thus placed in his hands appropriated to the payment of the debt to the state. He holds the fund but refuses to pay the debt.

His excuse for this apparently unjust course is, that in December, 1859, an arrangement was made between Ripley and Duncomb, by which an amount was assigned by Duncomb to Ripley equal to the debt, and for the purpose of paying it and thereupon a bond and mortgage, which had been given by Duncomb to Ripley to secure the debt, were released by Ripley; in consequence of which Farist claims that if he receives the

property for less than he expected to pay, yet in equity Ripley and his heirs, and the grantees of his Hartford tract, have no right to complain. But that transaction furnishes no foundation for the defense.

It appears that Ripley, when he conveyed to Duncomb in 1858, took from him, in addition to the agreement contained in the deed, a bond in the sum of $10,000, conditioned that Duncomb should pay to the state the $7,000; and he also took from him a mortgage of the same property to secure the bond. The reason for this does not appear. Probably it was done because Ripley wanted, besides the recital in the deed, a direct agreement from Duncomb under his own hand that he would pay the state. The effect of it was to create a personal liability on the part of Duncomb, outside and independent of the deed; so that he was still holden for the debt, after he had sold the land, and his grantee had assumed the payment. He therefore procured from Ripley (Dec., 1859,) an agreement to discharge the *bond,* and release the mortgage which had been given to secure *that.* The purpose undoubtedly was to cut him loose from any obligation connected with the property, in which he had no longer any interest, and to let the land float down into other hands with the liability attached.

The fallacy of Farist's argument in this part of the case consists in treating the bond and the agreement recited in the deed as identical, and supposing that a discharge of one was necessarily a discharge of the other. There is no such connection between them. They are related only as a note and a bond might be, where the bond with a mortgage had been given to secure the note. If in such a case the note alone should be found sufficiently safe, the bond and mortgage might be discharged, leaving the note in full force.

In respect to the fund claimed to have been furnished by Duncomb to Ripley, it does not appear what Duncomb paid Ripley for the agreement to discharge, or whether he paid anything. Duncomb was to exchange his stock in the Iron & Steel Works for Ripley's land in the state of New York, and his claim on the bond. That claim may have been of no value to Ripley, as the land mortgaged was abundantly suffi-

cient to pay the debt; and yet it might have been an object with Duncomb to prevent it from remaining out against him. It does not appear that the agreement was ever executed. There is no pretence that Ripley assumed to pay the state or that any of the parties so understood.

If the defense set up by Farist would operate in his favor, it should be fully proved, certainly against Edwin G. Ripley, the mortgagee of the Hartford property. The decree requires that Farist shall do just what he is bound to.

There is no error in the decree complained of.

In this opinion the other judges concurred.